ADAM GORDON
United States Attorney
BLANCA QUINTERO (CA 196889)
GEORGE V. MANAHAN (CA 239130)
Assistant United States Attorneys
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-7118 / 7607
Email: Blanca.Quintero2@usdoj.gov/ George.Manahan@usdoj.gov

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>CINDY JUSTICE (1),<br>ASHLEIGH DAVIS (2),<br><br>Defendants. | Case No. 24-CR-1229-LL<br><br>**UNITED STATES' TRIAL MEMORANDUM**<br><br>Trial Date:    March 10, 2026<br>Time:          9:30 a.m.<br><br>Honorable Linda Lopez |

The United States of America, by and through its counsel, Adam Gordon, United States Attorney, and Blanca Quintero and George Manahan, Assistant United States Attorneys, hereby files its Trial Memorandum.

## I

## STATEMENT OF THE CASE

**A.    Indictment**

On June 12, 2024, a federal grand jury in the Southern District of California returned an Indictment charging Defendants Cindy Justice and Ashleigh Davis with healthcare fraud, violations of the Anti-Kickback Statute (AKS), and conspiracy to violate those statutes. (ECF No. 1.) On August 14, 2025, a 22-count Superseding Indictment (SSI) was returned

charging Defendants Cindy Justice and Ashleigh Davis with healthcare fraud, violations of the AKS, and conspiracy to violate those statutes. (ECF No. 62.) Defendants were arraigned on the SSI on September 17, 2025. (ECF No. 66.) Defendants have pleaded not guilty to all charges.

**B.    <u>Trial Status</u>**

Trial is scheduled for March 10, 2026, at 9:30 a.m., before the Honorable Linda Lopez.  The United States anticipates that its case-in-chief will last nine to ten days.

**C.    <u>Defense Counsel</u>**

Defendant Cindy Justice is represented by attorney Gregory Vega.  Defendant Ashleigh Davis is represented by attorney Andrew Young.

**D.    <u>Custody Status</u>**

Defendants are not in custody.

**E.    <u>Interpreter</u>**

The United States does not require an interpreter.

**F.    <u>Jury Waiver</u>**

Defendants have not filed a jury waiver.

**G.    <u>Motions *In Limine*</u>**

On February 20, 2026, the Court made the following rulings on the Parties' motions:

1.    <u>Defendant Cindy Justice and Ashleigh Davis</u>

Neither Defendant Justice nor Defendant Davis filed any Motions *in Limine.*

2.    <u>United States' Motions *In Limine*</u>

A. Reserved ruling on Motion to Admit Co-Conspirator Statements;

B. Granted Motion to Admit Properly Noticed Expert Evidence (Molly Colombo, Dr. Sarah Jordan, and Dr. James Haaksma);

C. Granted Motion to Admit Appropriate Lay Witness Evidence;

D. Reserved ruling on Motion to Admit Certified Business Records Under Rule 902(11);

E. Granted Motion to Admit Certified Public Records, Including Defendant Justice's Admissions;

F.  Granted Motion to Admit Medical Records for Multiple Reasons, Including As Non-Hearsay Because Not Offered For Truth of Matters Asserted;

G.  Granted in part Motion to Admit Intrinsic Evidence Without Analyzing Rule 404(b), Or If Necessary, Under Rule 404(b) (CVS/Caremark's Audit - intrinsic; Facts Admitted By Defendant Justice In Her Stipulation With California Board of Pharmacy – intrinsic except 404(b) only as to four 2017 prescriptions); Inspector Woo's Other Investigations of PSRX – intrinsic but don't use term investigation before Humana complaint);

H.  Granted Motion to Admit Summary Charts of Voluminous Records;

I.  Reserved ruling on Motion to Exclude Evidence or Argument that Medicare Was Negligent;

J.  Granted Motion to Exclude Evidence or Argument Regarding Other Acts of Legitimate Provision of Pharmacy Services or Claims to Medicare, Or Other Good Acts;

K.  Denied as moot Motion to Exclude Evidence or Argument Regarding Others Culpability;

L.  Denied in part Motion to Exclude Evidence of State Medical Board Disciplinary Actions and Criminal History Regarding the United States' Witnesses (Dr. Roberson – denied; Dr. Haaksma – reserved ruling);

M.  Granted Motion to Exclude the Use of Law Enforcement Summaries for Impeachments Purposes;

N.  Reserved ruling on Motion to Exclude Evidence of The Manner of or Reason For the Death of Mark Sangree;

O.  Granted Motion to Compel Reciprocal Discovery.

**H.    Stipulations**

The Parties have agreed to have three witnesses testify at trial by video-recorded depositions which were taken on February 19, 2026. The United States wishes to address any objections made by Defendants during the video-taped depositions in advance of

presenting these witnesses' testimonies to the jury during trial.

The parties are continuing to confer on additional stipulations that could streamline the issues at trial, including stipulations regarding the authenticity of evidence based on Federal Rule of Evidence 902(11) certifications admitting business records or otherwise stipulating to authenticity without the need witness testimony.

## I.    Discovery

The United States will continue to comply with its discovery obligations. To date, the United States has produced approximately 8,619 documents. Defendants have not provided any reciprocal discovery.

## II

## STATEMENT OF FACTS AND LAW

## 1.  Background on Anti-Kickback Statute

The AKS, 42 U.S.C. § 1320a-7b(b), "makes it illegal to offer, pay, or receive anything of value as an inducement to generate business payable by Medicare or Medicaid." *United States ex rel. Sam Jones Co., LLC v. Biotronik, Inc.*, 152 F.4th 946, 951 (9th Cir. 2025). "[I]llegal remunerations for health care referrals" that violate the AKS are known as "kickbacks." *United States v. Hong*, 938 F.3d 1040, 1047 (9th Cir. 2019). The AKS prohibits kickbacks as long as one purpose of the payment is to induce a referral even if it is also intended to compensate for professional services. *See United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989). The AKS is violated when kickbacks are paid in exchange for referring Medicare or Medicaid beneficiaries' prescriptions to a pharmacy. *See United States v. Enriquez*, 131 F.4th 940, 947 (9th Cir. 2025).

The AKS broadly prohibits any payment to induce a referral of healthcare paid for by Medicare (such as a prescription for drugs that will be paid by Medicare Part D) unless the payments fall into one of the safe harbors outlined by the statute. *See Pfizer Inc. v. United States Dep't of Health & Hum. Servs.*, No. 1:20-CV-4920 (MKV), 2021 WL 4523676, at *15 (S.D.N.Y. Sept. 30, 2021), aff'd sub nom. Pfizer, Inc v. United States Dep't of Health & Hum. Servs., 42 F.4th 67 (2d Cir. 2022); *U.S. ex rel. Emanuele v. Medicor Assocs.*, No.

CV 10-245 ERIE, 2017 WL 1073270, at *1 (W.D. Pa. Mar. 21, 2017). For instance, certain personal services and management contracts and outcomes-based payment arrangements can fall within a safe harbor, but only if, among other things, payment is not determined in a manner that directly takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part by Medicare. *See* 42 C.F.R. § 1001.952(d). The AKS "makes no distinction between kickbacks earned from medically necessary services and those earned from unnecessary ones." *United States v. Eggleston*, 823 F. App'x 340, 344 (6th Cir. 2020). Knowingly submitting or causing to be submitted a claim to Medicare for services that are tied to illegal kickbacks, however, constitutes health care fraud. *See United States v. Golding*, 972 F.3d 1002, 1007 (8th Cir. 2020).

## 2. Overview of Defendants' Conspiracy to Defraud Medicare and Violate the Anti-Kickback Statute

Defendant Cindy Justice was the owner and president of Pacifico West Rx Inc., doing business as PureScience Rx (PSRX), a pharmacy located on Pomerado Road in Poway, California.[1] Defendant Ashleigh Davis, Justice's daughter, was a licensed Pharmacy Technician and operations manager of PSRX. Together, they schemed and conspired to pay kickbacks to obtain prescriptions for drugs that they billed to Medicare. Those drugs were largely, especially later in the conspiracy period, antibiotic, antifungal, and steroid drugs filled by their pharmacy. Defendants then billed Medicare Part D[2] for filling those prescriptions.

---

[1]    Defendant Justice co-owned PSRX with Mark Sangree until he sold Justice his 49% share of the common stock of PSRX in or around July 2020. Sangree and Justice also co-owned a Pharmacy in Melbourne, Florida named Amex Pharmacy.

[2]    Medicare Part D is an optional prescription drug benefit offered to Medicare-eligible beneficiaries. Part D coverage is generally managed/administered through private companies approved by Medicare, including drug plan "sponsors," which are prescription drug plans ("PDPs") (for beneficiaries with traditional Parts A & B coverage, or a Medicare Advantage plan (Part C) that does not include drug coverage) and Medicare Advantage prescription drug plans ("MAPDs") (when the plan includes Part C & Part D coverage), and pharmacy benefit managers (PBMs) who act as middlemen between sponsors, drug

5

The antibiotic prescriptions instructed the drugs to be used in a footbath, a portable device that is filled with water to allow the soaking of feet. As further described below, such prescriptions fit into a well-known fraudulent scheme which, as here, typically involved dispensing such drugs without medical necessity or pursuant to legitimate healthcare provider-patient relationships after payments of kickbacks to telemarketers and telehealth companies. Indeed, the United States will offer multiple communications Defendants wrote to their marketer coconspirators (almost always cc'ing the other Defendant) indicating they knew, or at the very least were deliberately ignorant of the fact that, the prescriptions they were receiving were to patients who were not seen or examined by a healthcare provider, did not want the drugs, and/or know why they were being prescribed. For instance:

- In mid-January 2019, shortly after she began working with a new set of marketer coconspirators, Defendant Davis wrote that of the first two referred patients she spoke to, one "stated she did not have any foot ulcers/fungus, but does have dry feet. She stated she is also diabetic" while the other stated "[s]he did not know why the doctor would prescribe the bath though, as she does not have any problems with her feet."

- In late February 21, 2019, Defendant Davis wrote that "Out of the 27 orders we have received so far . . . I have 4 pts that have refused, stating they do not have anything wrong with their feet."

- In May 2019, Defendant Davis wrote that of the prescriptions PSRX received that month that were referred by certain marketer coconspirators "8 of the pts I spoke with had no clue about the prescription or the doctor and denied foot problems."

Furthermore, the United States will offer testimony from its pharmacy fraud expert that such drugs are not approved by the Food and Drug Administration (FDA) or otherwise appropriate to be prescribed to be put into a footbath. Indeed, such drugs dispensed to be placed in a footbath are of limited clinical value and can be harmful to patients.

---

manufacturers, and beneficiaries. Medicare is administered by the Centers for Medicare & Medicaid Services (CMS), a federal agency within the United States Department of Health and Human Services.

Nevertheless, the expert will explain that such prescriptions have been seen by Medicare as part of schemes involving pharmacies paying kickbacks to marketers to obtain fraudulent prescriptions. (For simplicity here, the United States will refer to Defendants' scheme to commit health care fraud and violate the AKS as the "Footbath Scheme.")

**3. Mechanics of Defendants' Footbath Scheme**

Defendants' Footbath Scheme involved three groups of co-conspirators. The first group, the "marketers," used telemarketing call centers targeting Medicare beneficiaries to pressure them to express interest in being prescribed the expensive Footbath Scheme drugs and to share their personal identifiable information (PII). Defendants utilized marketers from no less than three companies: Midwest Medical Network, Vanguard Medical, and True Alliance Pros. As further described below, the United States will offer testimony from multiple marketers who, at Defendants' behest, pressured Medicare beneficiaries to receive Footbath Scheme drugs to be sent by PSRX, who then billed Medicare Part D for the drugs.

The marketers would send the Medicare beneficiary PII to the second group, the telehealth companies, who would generate fake prescriptions for the Footbath Scheme drugs, typically without contacting, let alone examining, the patients the prescription were written for, and often without the knowledge or approval of the healthcare provider whose purported signature was placed on the prescription. Indeed, the United States will offer testimony from two such providers who will state they never wrote the prescriptions or associated medical records containing their names.

The prescriptions were then sent to the third group, PSRX (i.e., Defendants' pharmacy), who would file a claim with Medicare after (at least usually) sending the drugs to the Medicare beneficiaries. As further described below, Defendants would then pay a percentage of the profit they obtained from Medicare (i.e., a kickback) in exchange for the prescription referral. Through testimony of the marketers, beneficiaries, beneficiaries' family members and health care providers, and the United States' pharmacy fraud expert, the United States will demonstrate that such claims were fraudulent for multiple reasons, including that the prescriptions were not based on a legitimate healthcare provider-patient

relationship, were not supported by an appropriate medical examination, were not ordered for medically accepted indications, were not prescribed in appropriate ways (e.g., not prescribed in ways the drugs were approved to be used by the Food and Drug Administration or other appropriate medical compendia), and were induced by the payments of illegal kickbacks.

The United States intends to use the following demonstrative (or a substantially similar one) to explain the scheme to the jury:



Powerful evidence that Defendants knew that the prescriptions they were receiving were not based on the medical needs of the patients, but were prescriptions being churned out in exchange for Defendants' kickbacks is the fact that Defendants caused the drugs being prescribed to change based, not on an analysis of the medical needs of the patients, but on the higher profits Defendants determined would be generated from Medicare payments. For instance, in May 2020, Defendant Davis wrote her marketer coconspirators, cc'ing Defendant Justice:

As we have all seen over the past 6 months that Vancomycin reimbursements have dropped drastically. We were recently given information on an alternative medication

for Vanco. A medication that is already in powder form called Daptomycin can be used in leu of Vanco. It is dispensed in 500mg vials (10ml/vial) and the pt is prescribed 30 vials, one vial per day for each treatment added to the foot bath water. The cost for 30 vials would be approximately $2,700 but the reimbursement is around $6700. I ran a test claim today to make sure the Insurance formularies had not changed and Humana is still covering this medication with low copays.

Tellingly, soon after Defendant Davis wrote this email, the Footbath Scheme prescriptions for patients covered by Humana Insurance swapped Daptomycin for Vancomycin in their 3-drug combination. Therefore, Defendants were fully aware that the prescriptions they were receiving were not being written based on a health care provider exercising independent medical judgment on the need of the patient. Rather, the marketer coconspirators Defendants were paying illegal kickbacks to were able to procure prescriptions for drugs based on the recommendation of a pharmacy technician (Defendant Davis) who had no medical training or knowledge of the patients the drugs were being prescribed to, based only on the fact that the drug resulted in higher profits than the drug they swapped it for.

Indeed, after a coconspirator asked whether the high profit margin would also be true of patients that had CVS/Caremark as their insurer, Defendant Davis responded:

I ran a test claim for an exi[s]ting foot bath Caremark pt. The plan did cover the medication but paid at 3207.74, with a cost of 2700, the margins are better for Vanco, at least with Caremark

Such evidence is highly probative of the fact that Defendants were aware that their marketer coconspirators could direct which drugs were being prescribed based on what insurance company covered the patient and how much those companies paid for different drugs (rather than the medical needs of the patients the prescriptions were written for).

Other evidence that Defendants were aware that the Footbath Scheme drugs were not being written based on the needs of the patients will include testimony from a former PSRX employee, who will testify that only Defendants Justice and Davis were supposed to talk to patients about the Footbath Scheme drugs. Indeed, she will testify Defendant Justice would often try to convince Medicare beneficiaries to accept Footbath Scheme drugs, telling them that they're "like magic" and a "miracle cream." Such statements—which one would typically associate with a snake-oil salesman rather than the owner of a pharmacy—are

9

1  powerful indicators regarding her knowledge that Footbath Scheme was designed to generate

2  fake prescriptions to be fraudulently billed to Medicare.

### 4. Marketer Coconspirators

4         Multiple marketers who have pleaded guilty in other districts to conspiracy to receive

5  kickbacks in exchange for referrals of prescriptions to other pharmacies in violation of the

6  AKS and commit health care fraud will testify that they similarly conspired with

7  Defendants. Specifically, these cooperators will testify that they used call centers to pressure

8  Medicare beneficiaries to express interest in receiving the Footbath Scheme drugs. They

9  then passed that information to the same telemedicine companies they used in the scheme

10 they pleaded guilty to, who would send prescriptions for the Footbath Scheme drugs to

11 PSRX. PSRX would then fill the prescriptions and submit claims to Medicare for payment,

12 and Defendants would kick back a percentage of those payments to the marketers (who

13 would use part of the money to pay kickbacks to the telehealth company and the call

14 centers).

15        The lengths that Defendants went to disguise the basis of their payments to the

16 marketers evidence both their knowledge of the AKS, and that their payments to the

17 marketers violated that statute. The marketers will testify that Defendants instructed them

18 to create fake invoices purporting to base the value of payments on the number of hours

19 worked by the marketers (presumably to try to fit into the personal services contracts safe

20 harbor). The marketers will explain, however, that the number of hours were lies. In

21 actuality, after determining the amount Defendants owed the marketers based on their

22 agreement regarding the percentage of the profit from the Medicare payments that would

23 be paid to the marketers (typically in the 40%-50% range), the marketers would simply

24 divide that number by the agreed-upon pretend hourly rate (typically $125 per hour) to

25 calculate the made-up number of hours worked. Throughout their scheme, Defendants paid

26 their coconspirator marketers hundreds of thousands of dollars in illegal kickbacks based

27 on such made-up invoices that Defendants required the marketers to issue.

28

*24-CR-1229-LL*

Evidence that Defendants insisted on receiving invoices purporting to base their payments to the marketers on a made-up number of hours worked, covering-up that the payments were actually based on a percentage of the profit from the Medicare payments, will include Defendants' emails. For instance, in March 2019, Defendant Justice wrote to marketers, "I have an opportunity to purchase large volume for better pricing on some of the drugs used for the foot baths including the baths." One of her marketer coconspirators responded that since "our other partners we are compensated much higher amount so we would send scripts but not a ton." Defendant Justice responded by asking how the "margins" for certain prescriptions from the last two months "compared to your other partners?" The marketer coconspirator responded by showing the reimbursement from Humana Insurance for certain Footbath Scheme drugs to one of the other pharmacies he worked with and their cost of goods (to demonstrate the profit they were illegally sharing). Defendant Justice responded by showing how much PSRX would be paid by Humana Insurance for those drugs and PSRX's cost for those drugs, writing:

> My cost is $ 22.95 higher on the vancomycin but we make it up with much better pricing on the Clindamycin and the Keto. . . . Better pricing on the Clindamycin and the Keto and taking into consideration the increase cost of $22.95 on the Vancomycin you would have an increase net of $197.82 with us. My price on all three of the NDC numbers is not volume, I should be able to do better with volume.

In late May 2019, Defendant Justice sent the marketer coconspirator a table showing the "% profit" from prescriptions to 3 patients, stating "I believe you confirmed our reimbursement in now equal to your other partners."

This discussion only makes sense because Defendants were not paying based on the number of "marketing hours" worked; rather, they were clearing illegally paying their marketer coconspirators kickbacks based on a percentage of the profit received from Medicare for prescriptions drugs. Indeed, Defendant Justice expressed her understanding that the point of generating invoices pretending to base Defendants' payments to the marketers on a made-up number of hours worked was to cover-up their violating the AKS when she emailed that "With sales groups and Medicare guidelines, you submitting the

11

hourly invoice is key to our ability to stay on the right side of the regulations regarding payment for a referral." In other words, Defendant Justice understood that the marketer invoices to PSRX that pretended to base payment on a made-up number of hours worked was necessary to hide PSRX's illegal payments under Medicare guidelines, i.e., the AKS.

Other email discussions evidence that Defendants knew the marketers were obtaining fake prescriptions for Footbath Scheme drugs. For instance, in early July 2019, Defendant Justice wrote her marketer coconspirators that "I have a large inventory for foot baths. I would like to move some product this week. Are your physicians still supporting this protocol?" She later added "[y]our group is the only group prescribing and I have a lot of inventory I would like to get out. If there is a problem please be candid." These statements demonstrate, among other things, that Defendant Justice knew that most (i.e., legitimate) physicians would not prescribe the Footbath Scheme drugs, which is why she only knew of one "group" willing to write such prescriptions (and why she had to pay kickbacks to get such prescriptions), but there were likely to be problems even with that group since they were writing fake prescriptions.

**5.  Medicare Beneficiaries, Their Family Members, and/or Their Physicians**

Multiple Medicare beneficiaries and/or their family members will testify that they received large amounts of drugs from PSRX despite not knowing of, or having a relationship with, that pharmacy or the healthcare provider who purportedly prescribed the drugs. They will testify the drugs were frequently not used as directed since they did not know why the drugs were mailed to them and/or what they were for. Indeed, some still had the (at least mostly) unused drugs years later when investigators came to speak to them; photographs of such drugs will be presented at trial. Also, some of the beneficiaries' actual doctors will testify that the beneficiaries did not have a diagnosis that would support the Footbath Scheme drugs to be prescribed to them, they did not know why they were prescribed and/or they would never order such drugs to be used as prescribed.

**6. Audits, Investigations and Civil Proceedings Against PSRX**

<u>**CVS/Caremark**</u>

On or about June 27, 2018, an auditor from CVS Caremark (a Medicare Part D PBM) went to PSRX to conduct an on-site audit of the pharmacy. She noted several indicators of fraud, including that many prescriptions were on pre-printed templates, that many of the prescriptions were for patients who lived far from the pharmacy, and evidence the prescribing physicians denied having prescribed the medications. She also saw various return packages with patient comments such as "don't send any more" and "don't need . . . not familiar with them to use." Although at that time most, if not all, of the drugs involved were not those involved in the Footbath Scheme, the United States evidence will show that these markers of fraud continued as Defendants' scheme became increasingly focused on the Footbath Scheme in the months that followed. At the time of the on-site audit, Defendant Davis provided the necessary requested information and documentation to the auditor and signed the Pharmacy Audit Acknowledgement as the "Admin Manager."

<u>**Humana**</u>

Defendants' Footbath Scheme largely targeted beneficiaries whose Medicare Part D or Medicare Advantage Prescription Drug (MAPD) plan was administered by Humana Insurance Company. After Humana received a request for documents related to PSRX in August 2018, its Special Investigations Unit began an internal investigation of PSRX. That investigation culminated in Humana reporting suspected fraud by PSRX between August 2019 to July 2020 to both Qlarant, CMS' Investigations Medicare Drug Integrity Contractor (I-MEDIC),[3] and the California Board of Pharmacy. Most glaringly, the number and cost of PSRX's claims climbed precipitously starting in late 2019, peaking in July 2020 to over $1.4 million in that month alone (whereas PSRX's monthly claims to Humana were less than $30,000 per month from September to November 2019). This increase was driven largely and unusually by a few drugs prescribed by a small number of prescribers, which

---

[3]     The I-MEDIC is a specialized entity contracted by CMS to detect, prevent, and investigate fraud, waste, and abuse regarding the Medicare Part D program.

the United States' pharmacy fraud expert will explain is consistent with having inappropriate kickback relationships with prescribers and associated fraudulent activity.

At the end of their investigation, Humana identified 21 of its beneficiaries who received drugs from PSRX who denied requesting and/or receiving the drugs for which PSRX submitted claims and identified a prescriber who denied authorizing the prescriptions. Humana determined that a large amount of PSRX's prescriptions during the period of abrupt rise were written for the drugs to be diluted in a foot bath, raising questions whether the drugs were being used for medically acceptable indications. Also, Humana determined a high reversal rate of claims submitted by PSRX, indicating that they were submitting "test claims"[4] in support of fraudulent billing.

### California Board of Pharmacy

California Board of Pharmacy Inspector Christopher Woo, who had investigated PSRX previously, led the investigation based on Humana's referral. Upon performing a drug audit of PSRX, he found a discrepancy of 34,080 grams between the amount of Gentamicin 0.1% cream (one of the foot bath drugs) dispensed versus acquired by PSRX, indicative that over $78,000 of claims for that drug were not actually sent to patients.

Inspector Woo also investigated Humana's findings by communicating with most of the 21 patients identified by Humana, the prescribers of the drugs PSRX billed Medicare for those patients, employees of PSRX (including the two Defendants) and the telehealth company that issued the prescriptions. He determined that PSRX's claims for 49 prescriptions written for 13 of those patients were fraudulent because the prescriptions were not written or otherwise authorized by the purported prescribers. PSRX billed Humana $76,546.28 for those prescriptions and was paid $74,240.22 for them.

On March 10, 2023, Defendant Cindy Justice, as CEO, President, Secretary, CFO, and 100% shareholder of PSRX, admitted that between March 30, 2018, and February 4, 2021, PSRX purportedly dispensed 34,080 more grams of Gentamycin 1% cream than they

---

[4]    A "test claim" is a claim sent by the pharmacy to the PBM to determine the coverage of a particular drug on a patient's plan.

had purchased from medical wholesalers. Defendant Justice also admitted that between January 16, 2019, and May 26, 2020, PSRX falsely billed 49 prescriptions, totaling $76,546.28 to an insurance company (Humana) which were not written or otherwise authorized by prescribers, for which PSRX was paid $74,240.22. These include prescriptions written to the beneficiaries named in the substantive health care fraud counts of the SSI.

**III**

**WITNESSES**

The United States identifies the following witnesses to be called in its case-in-chief, but reserves the right to call fewer or more witnesses.

1.  Dr. Patricia Bailey (Nurse Practitioner) (testimony via video-taped deposition)

2.  Mark Belter (Co-conspirator)

3.  Dianne Bomber (Beneficiary)

4.  Rebecca Brown (Beneficiary Family (testimony via video-taped deposition)

5.  FBI SA Seth Bryan (FBI)

6.  Amy Burt (Beneficiary Family)

7.  Molly Colombo (Expert)

8.  FBI SA Kelvy Coney

9.  April Dawn Day (Nurse Practitioner)

10. Lauren Dotzler (CVS Caremark Auditor)

11. James Feeley (Co-conspirator)

12. Dan Girsch (Humana SIU) (Insurance Carrier)

13. Lynn Gray (Beneficiary)

14. Vernon Greene (Beneficiary Family)

15. Dr. James Haaksma (Beneficiary PCP)

16. Deborah Hair (Beneficiary) (testimony via video-recorded deposition)

17. Dr. Sarah Jordan (Podiatrist)

18. Maria Lopez (Former PureScience Rx Employee)

19.    FBI SA Ty Vonn Peterson

20.    Dr. Brett Roberson (PureScience Employee)

21.    Dr. Jonathan Smedley (Beneficiary Podiatrist)

22.    Kerria Snow (Beneficiary Family)

23.    Melissa Sperti (Missy) (Co-conspirator)

24.    Melissa Taylor (Beneficiary Nurse Practitioner)

25.    Eric Van Vleet (Co-conspirator)

26.    Alexis Vittengl (Qlarant Data Analyst)

27.    Christopher Woo (California Department of Pharmacy)

28.    Dr. Maria Yssa (Beneficiary PCP)

**IV**

**EXHIBITS**

The United States will file an exhibit list with the Court by the first day of trial. Presently, the United States intends to offer into evidence or use the following:

1.    Certified California Secretary of State Record; Certified DMV records of all substantive count beneficiaries.

2.    Certified California Board of Pharmacy documents, including but not limited to, a Stipulated Surrender of License and Order as to Pacifico West Rx Inc., dba PureScience and the attached First Amended Accusation No. 7073 of the California Board of Pharmacy entered into between Defendant Justice and the California Board of Pharmacy.

3.    Certified Records from Humana Insurance and CVS Caremark.

4.    Prescriptions and other accompanying documents for Medicare beneficiaries, not limited to substantive count Medicare beneficiaries.

5.    Footbath basin massager.

6.    Photographs of footbath and prescribed medications.

7.    Bank Records of PureScience Rx and Defendants.

8.    Medicare Part B Records, including claims data.

9.    Emails to and from Defendants and co-conspirators and others.

10.    Summary Exhibits summarizing voluminous records, including Medicare claims data and bank records.

**V**

**LEGAL ISSUES**

**A. Elements – Count 1:  18 U.S.C. § 371 – Conspiring to Commit Health Care Fraud and Pay Unlawful Remuneration**

The defendants are charged in Count one of the SSI with conspiring to commit health care fraud, pay unlawful remuneration, and make false statements, in violation of Section 1347 of Title 18, Section 1320a-7b(b)(2)(A) of Title 42, and Section 371 of Title 18 of the United States Code.  For the defendants to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

1.    First, beginning no later than in or around 2018 and continuing through at least August 2020, there was an agreement between two or more persons to commit at least one crime as charged in the indictment;

2.    Second, the defendants became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

3.    Third, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

Model Crim. Jury Instr. 9th Cir. 11.1 (Conspiracy Elements).

A conspiracy is a kind of criminal partnership—an agreement of two or more persons to commit one or more crimes.  The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed.

For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy.  It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another.  You must find that there was a plan to commit at least one

17

of the crimes alleged in the indictment as an object of the conspiracy with all of you agreeing as to the particular crime which the conspirators agreed to commit.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy. Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the originators. On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator. Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.

An overt act does not itself have to be unlawful. A lawful act may be an element of a conspiracy if it was done for the purpose of carrying out the conspiracy. The government is not required to prove that the defendant personally did one of the overt acts.

A defendant "is liable for the acts of his co-conspirators though he was not aware of the performance of those acts, nor even of the existence of the actors." *United States v. Roselli*, 432 F.2d 879, 894 (9th Cir. 1970) (quoting *Hernandez v. United States*, 300 F.2d 114, 120 (9th Cir. 1962)); *see also* Model Crim. Jury Instr. 9th Cir. 11.6 (Conspiracy— Liability for Substantive Offense Committed by Co-Conspirator (Pinkerton Charge)). Therefore, for instance, the government is not required to identify a specific coconspirator who submits a fraudulent claim, but only to provide sufficient proof, direct or circumstantial, that a fraudulent claim was submitted or caused to be submitted by a coconspirator for a defendant to be guilty of health care fraud. *Cf. Roselli*, 432 F.2d at 895-96; *see also United States v. Martinez*, 921 F.3d 452, 472 (5th Cir. 2019) (discussing aiding and abetting liability).

**B. <u>Elements – Counts 2 - 10:  18 U.S.C. § 1347 – Health Care Fraud</u>**

The defendants are charged in Counts 2 through 10 of the SSI with health care fraud, in violation of Section 1347 of Title 18 of the United States Code. For the defendants to be

found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

1.    First, the defendants knowingly and willfully executed a scheme or plan to defraud a health-care benefit program, or to obtain money or property owned by, or under the custody or control of, a health-care benefit program by means of material false or fraudulent pretenses, representations, or promises;

2.    Second, the defendants acted with the intent to defraud; that is, the intent to deceive and cheat;

3.    Third, Medicare was a health care benefit program; and

4.    Fourth, the scheme was executed in connection with the delivery of or payment for health-care benefits, items, or services.

Model Crim. Jury Instr. 9th Cir. 15.42 (Health Care Fraud Elements) (modified); *see also United States v. Awad*, 551 F.3d 930, 939 (9th Cir. 2009).

"Health-care benefit program" means any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

"With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section." 18 U.S.C. § 1347(b).

If the court determines "the jury could rationally find willful blindness even though it has rejected the government's evidence of actual knowledge . . . the court may give a *Jewell* instruction." *United States v. Walter-Eze*, 869 F.3d 891, 909 (9th Cir. 2017). A *Jewell* instruction explains that a defendant "can be found to have acted 'knowingly' if the individual 'consciously avoided' obtaining actual knowledge." *Id.* "[I]if the record contains evidence to support a deliberate ignorance instruction, it does not matter that the government primarily relied upon a theory of actual knowledge." *Id.* In *Walter-Eze*, the Ninth Circuit determined such instruction was appropriate even if the defendant "did not know about the illegal kickbacks and healthcare fraud" if "she deliberately failed to

*24-CR-1229-LL*

investigate while being aware of a high probability of the fraud." *See id; see also United States v. Shayota*, 784 F. App'x 986, 990 (9th Cir. 2019) (upholding deliberate ignorance instruction because "[d]espite their exposure to numerous suspicious aspects of the scheme, the [defendants] continued to participate"); *United States v. Salman*, 618 F. App'x 886, 890 (9th Cir. 2015) (upholding deliberate ignorance instruction because "under circumstances where a reasonable person would make further inquiries, a failure to investigate can be a deliberate action") (cleaned up).

C. **Elements – Counts 11 - 22:  42 U.S.C. § 1320a-7b(b)(2)(A) – Payment of Illegal Remuneration**

The defendants are charged in Counts 11 through 22 of the SSI with offering to pay and paying kickbacks in connection with Medicare payments in violation of Section 1320a-7b(b)(2)(A) of Title 42 of the United States Code.  For the defendants to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

1.    First, the defendants knowingly and willfully offered to pay or paid money directly or indirectly to a person;

2.    Second, the money was offered or paid and at least one purpose of the payment was to induce or in exchange for a referral furnishing or arranging for the furnishing of a prescription for drugs for a patient insured by Medicare;

3.    Third, the patient's prescription for drugs was covered, in whole or in part, by Medicare; and

4.    Fourth, Medicare is a federal health care program.

Model Crim. Jury Instr. 9th Cir. 24.25 (25 Soliciting or Receiving Kickbacks in Connection with Medicare or Federal Health Care Program Payments Elements) (modified); *see also Hong*, 938 F.3d at 1049 (unlawful remunerations include sums for which no actual service was performed).

"With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section."  42 U.S.C. § 1320a-7b(h).

## VI

## **PROPOSED VOIR DIRE**

The United States has filed proposed *voir dire* questions under a separate filing. ECF 28.

## VII

## **JURY INSTRUCTIONS**

The United States will submit proposed jury instructions under separate cover.

DATED: March 3, 2026.                    Respectfully submitted,

                                         ADAM GORDON
                                         United States Attorney

                                         *s/ George Manahan*
                                         BLANCA QUINTERO
                                         GEORGE V. MANAHAN
                                         Assistant U.S. Attorneys

21